# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MECHEL LOVELACE, individually
and on behalf of her minor child,
DAKOTA LOVELACE,

       Plaintiffs,

vs.                                                                          No. CIV 10-0763 JB/WPL

COUNTY OF LINCOLN; RICK VIRDEN
individually and in his capacity as LINCOLN
COUNTY SHERIFF; ROBERT SHEPPERD
individually and in his capacity as
LINCOLN COUNTY UNDERSHERIFF;
KELLY LOVELACE and JOHN DOES I & II,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss and for

Qualified Immunity and for a Stay of Discovery, and Supporting Memorandum, filed by Defendants

Sheriff Rick Virden, Undersheriff Robert Shepperd, and Kelly Lovelace on January 12, 2011 (Doc.

19).  The Court held a hearing on March 18, 2011.  A stay of discovery was granted on February 23,

2011.  <u>See</u> Doc. 24.  The primary issues are: (i) whether the individual Defendants violated Dakota

Lovelace's substantive due-process rights under the Fourteenth Amendment to the United States

Constitution; and (ii) whether the acts or omissions of the Defendants caused danger to Plaintiff

Mechel Lovelace and D. Lovelace and placed them in extreme emotional distress.  Because none

of M. Lovelace's causes of action state a claim upon which relief may be granted, the Court will

grant the motion to dismiss.

## FACTUAL BACKGROUND

On August 16, 2010, M. Lovelace on her own behalf and on behalf of her minor biological daughter, D. Lovelace, initiated in this Court her lawsuit against the Defendants based on events that occurred in Lincoln County on March 4, 2010. See Complaint, filed August 16, 2010 (Doc. 1). M. Lovelace filed her First Amended Complaint & Jury Demand on December 10, 2010. See Doc. 13 ("Complaint"). The Complaint alleges the following facts.

M. Lovelace was married to Gary Joe Lovelace. See Complaint ¶ 10, at 3. On March 4, 2010, M. Lovelace and G. Lovelace were involved in a domestic dispute at their home/concrete business during which G. Lovelace became physically and emotionally abusive. See Complaint ¶¶ 11, 13, at 3-4. M. Lovelace's aunt called 911, and law enforcement officers responded. See Complaint ¶ 12, at 4. While the officers were en route to the Lovelaces' home/business, they encountered G. Lovelace driving away on a piece of heavy equipment. See id.; id. ¶ 10, at 3. G. Lovelace then drove the machinery back to his home/business. See Complaint ¶ 13, at 4. The officers confronted G. Lovelace, and in the course of trying to apprehend him, G. Lovelace assaulted the police chief by kicking her in the face. See Complaint ¶ 14, at 4. G. Lovelace then locked himself in a small building on the property, which was used as an office, to avoid arrest. See Complaint ¶ 13, at 4.

D. Lovelace was not at the property during the domestic dispute. She had gone to school that morning, but in response to multiple telephone messages that G. Lovelace left, she received permission from the school to, and she did, return home. See Complaint ¶¶ 16-17, at 4-5. At the time she arrived home, Lincoln County police officers had surrounded the office; D. Lovelace learned that G. Lovelace had barricaded himself inside the office and refused to leave. See Complaint ¶ 18, at 4-5. She knew that G. Lovelace had guns inside the building. See Complaint

¶ 19, at 5.  With the Lincoln County Sheriff's Office permission, D. Lovelace approached the office, and through the window in the office door pleaded with her father not to kill himself and to turn himself in to the police.  <u>See</u> Complaint ¶ 20, at 5.  G. Lovelace asked D. Lovelace "to find out if the Carrizozo Police Chief was seriously injured."  Complaint ¶ 21, at 5.  D. Lovelace ran to the chief and the chief told her that G. Lovelace was going to jail for battery on a police officer.  <u>See</u> Complaint ¶ 22, at 5.  D. Lovelace then saw a police officer yelling at her mother, who was standing by their house.  <u>See</u> Complaint ¶ 23, at 6.

Defendant Kelly Lovelace, G. Lovelace's ex-wife and an on-duty Lincoln County dispatcher, arrived at the property.  <u>See</u> Complaint ¶ 13, at 6.  Defendant Robert Shepperd, Lincoln County Undersheriff, allowed K. Lovelace to take D. Lovelace into the office "to try and talk Gary Joe Lovelace into surrendering and prevent him from killing himself."  Complaint ¶ 25, at 6.  "All defendants could see through the door that [G] Lovelace had a gun pointed at his chest."  Complaint ¶ 26, at 6.

When Defendant Rick Virden, Lincoln County Sheriff, arrived at the scene, he looked into the office and saw G. Lovelace "with a gun pointed to his chest," while D. Lovelace and K. Lovelace stood next to him.  Complaint ¶ 29, at 6-7.  Virden suddenly broke the window, and "grabbed and wrestled [G.] Lovelace and D[.] Lovelace down to the ground."  Complaint ¶¶ 30- 31, at 7.  "D[.] Lovelace had been standing on a set of wooden box springs and was pinned between Virden and the box springs."  Complaint  ¶ 32, at 7.  Other officers had by then disarmed G. Lovelace.  <u>See id.</u>  "Virden got into D[.] Lovelace['s] face yelling at her that if she hadn[']t been playing games with her dad, it would have been over."  Complaint ¶ 33, at 7.  D. Lovelace suffered minor injury -- scrapes and contusions -- during the apprehension.  <u>See</u> Complaint ¶ 34, at 7.

## PROCEDURAL BACKGROUND

As a result of these alleged events, M. Lovelace asserts multiple claims.  Her federal claims are asserted pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, and are as follows: (i) "due process; deliberate indifference to an obvious risk of severe harm; state created danger;" (ii) "violation of substantive due process, failure to protect;" and (iii) "failure to supervise" and train.  Complaint at 7, 9 & 10-11.  M. Lovelace also asserts state-law claims for violation of the "constitution," and for intentional and negligent infliction of emotional distress.  See Complaint at 11.

Virden, Shepperd, and K. Lovelace contend, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, that, because M. Lovelace's causes of action fail to state claims upon which relief may be granted, the Court should dismiss the claims against them.  See Motion to Dismiss, filed January 12, 2011 (Doc. 19), at 1.  The individual Defendants also contend that they are entitled to qualified immunity with regard to the federal claims asserted against them.  See Motion to Dismiss at 1.  Because of their assertion of a qualified immunity defense, they request that the Court stay discovery pending a decision on their motion.  By order entered February 23, 2011 (Doc. 24), the Court stayed discovery pending a decision on the motion based on the assertion of the qualified-immunity defense.

On March 18, 2011, the Court held a hearing on the Motion to Dismiss.  During the hearing, the individual Defendants argued that M. Lovelace was not in any zone of danger and that she was someplace else at the time G. Lovelace was finally apprehended.  See Transcript of Hearing at 6:4-7 (taken March 18, 2011)("Tr.").[1]  Without describing the zone of danger, M. Lovelace argued that

---

[1]The Court's citations to the transcript are to the Court Reporter's original, unedited version. A final version may have slightly different line or page numbers.

-4-

the incident occurred in a rather small space.  <u>See</u> Tr. at 19:7-9.  She stated that the business office was across the driveway from the home and that she was standing on the front porch of the home. <u>See</u> Tr. at 19:16-20; Complaint ¶ 47 at 10.[2]

M. Lovelace insisted, at the hearing, that G. Lovelace was not intending to commit suicide. <u>See</u> Tr. at 34:17-25.  When questioned by the Court about the allegations which state that G. Lovelace had a gun pointed at his chest, M. Lovelace admitted that the Court could make the inference that it was a possible suicide and that suicide could have been the outcome of the confrontation.  <u>See</u> Tr. at 35:1-10, 35:22-23.  M. Lovelace further conceded that, when fashioning her analysis, she did not consider whether persons other than D. Lovelace were in danger.  <u>See</u> Tr. 36:6-13.  M. Lovelace, in discussing her claims, stated that she was using the New Mexico Torts Claim Act,  NMSA 1978, §§ 41-4-1 through 41-4-30 ("NMTCA"), as a means to restate her constitutional tort claim.  <u>See</u> Tr. at 40:3-4.

Towards the end of the hearing, the Court asked M. Lovelace whether, if the Court found that there was no constitutional violation or a waiver of the NMTCA, there would be any benefit to allowing the Complaint to be amended, and she responded that, although additional facts could be added, ultimately the analysis would not change.  <u>See</u> Tr. at 41:19-42:6.

### <u>LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)</u>

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint

---

[2]At another time, M. Lovelace indicated that the office was located at the other side of the parking lot from the home.  <u>See</u> Tr. at 25:1-3.

is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).  A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (internal citation omitted).  "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (alterations omitted).  "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (italics in original).  The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a

> complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the United States Constitution or from federal statute. See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights."). Rather, § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. Thus, to state a claim upon which relief can be granted under § 1983, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, slip op., 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to

the federal judiciary to displace state law through the creation of a body of general federal tort law.

See Griffin v. Breckenridge, 403 U.S. 88, 101-02 (1971)(civil-rights statute); Paul v. Davis, 424

U.S. 693, 701 (1976)(Fourteenth Amendment).

## LAW REGARDING SUBSTANTIVE-DUE-PROCESS CLAIMS

The Due Process Clause of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own acts and not for the acts of third parties. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195. The Due Process Clause is not a guarantee of minimal levels of safety and security. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195. "As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 197. See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1125 (10th Cir. 2008). Generally, negligence does not trigger the Due-Process Clause's protections. See Davidson v. Cannon, 474 U.S. 344, 348 (1986).

There are, however, two exceptions to this general rule. First, the special-relationship doctrine arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003). Second, the danger-creation theory provides that a state may also be liable for an individual's safety if it created the danger that harmed the individual. See id.

1.      **Special-Relationship Doctrine**.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). "Absent involuntary restraint, however, no duty to protect arises under the special-relationship theory." Christiansen v. City of Tulsa, 332 F.3d at 1280.

2.      **Danger-Creation Exception**.

The Due-Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when there has been an affirmative acts by a state actor to create or increase a plaintiff's vulnerability to or danger from private violence. See Robbins v. Oklahoma, 519 F.3d at 1251. The Tenth Circuit has focused on the deliberateness of the conduct. See Christiansen v. City of Tulsa, 332 F.3d at 1281. Under a danger-creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at a substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly with conscious disregard of that risk; and (vi) such conduct, when viewed in its totality,

-9-

must shock the conscience.  See Rost _ex rel_. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d at 1126.

Even if sufficient affirmative conduct has been alleged, the ultimate measure of whether conduct by state actors violates due process is whether "the challenged government action 'shocks the conscience' of federal judges."  Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002)(quoting Uhlrig v. Harder, 64 F.3d at 573).  "It is well settled that negligence is not sufficient to shock the conscience.  In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Uhlrig v. Harder, 64 F.3d at 574.  "This is a 'high level of outrageousness.'"  Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances 'three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.'

Camuglia v. City of Albuquerque, 448 F.3d 1214 at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).  "These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances."  Ruiz v. McDonnell, 299 F.3d at 1184 (citation and quotation marks omitted).

The shock-the-conscience requirement applies to both the special-relationship doctrine and the danger-creation theory.  See Johnson _ex rel._ Estate of Cano v. Holmes, 455 F.3d 1133, 1142-43 (10th Cir. 2006)("On appeal, the personal representative argues that a 'shocks the conscience' test

only applies to 'danger creation' claims and does not apply to 'special relationship' claims. This argument is directly precluded by our precedent.").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. at 807. "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. Civ. 08-0181, slip op., 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would

understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473

F.3d 1323, 1327 (10th Cir. 2007).  In determining whether the plaintiff has met his or her burden,

the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See

Scott v. Harris, 550 U.S. 372, 378 (2007).  A clearly established right is generally defined as a right

so thoroughly developed and consistently recognized under the law of the jurisdiction as to be

"indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983),

cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established, there

must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains."  Currier v.

Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493,

1498 (10th Cir. 1992).  On the other hand, the Supreme Court of the United States has observed that

it is generally not necessary to find a controlling decision declaring the "very action in question .

. . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right

was 'clearly established,' the court assesses the objective legal reasonableness of the action at the

time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that

a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel.

Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S.

at 202).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances of the particular

case at hand."  129 S. Ct. at 821.  The Supreme Court also noted in Pearson v. Callahan that, while

no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial.  See 129

S. Ct. at 821.  Once the plaintiff has established the inference that the defendant's conduct violated

a clearly established constitutional right, a qualified-immunity defense generally fails.  See Cannon

v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

### LAW REGARDING FAILURE TO SUPERVISE AND TRAIN

The Supreme Court has made clear that there is no *respondeat superior* liability under §

1983.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009)("Because vicarious liability is

inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution.");  Bd. of

Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the

basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Bd. of

Cnty. Comm'rs v. Brown, 520 U.S. at 403.   "[W]hen a plaintiff sues an official under . . . § 1983

for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly

plead and eventually prove not only that the official's subordinates violated the Constitution, but that

the official by virtue of his own conduct and state of mind did so as well."  Dodds v. Richardson,

614 F.3d 1185, 1198 (10th Cir. 2010).   Thus,

> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates,
> promulgates, implements, or in some other way possesses responsibility for the
> continued operation of a policy the enforcement (by the defendant-supervisor or her
> subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the
> deprivation of any rights  . . . secured by the Constitution . . ."

Dodds v. Richardson, 614 F.3d at 1199.  A municipality cannot be held liable under § 1983 for an

employee's acts if the employee committed no constitutional violation.  See Myers v. Okla. Cnty.

Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998);  Jonas v. Board of Comm'rs of Luna

County, 699 F. Supp. 2d 1284, 1302 (D.N.M. 2010)(Browning, J.).

-13-

Supervisory liability requires "proof of the municipality's deliberate indifference to its inhabitants." Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted). See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."). "[W]here a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants, that failure to train may be properly thought of as a city policy . . . [and] is actionable under § 1983." Novitsky v. City of Aurora, 491 F.3d 1244, 1259 (10th Cir. 2007)(quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989))(alterations in original, internal quotation marks omitted). "Negligence[, however,] is not a basis for liability under § 1983." Darr v. Town of Telluride, Colo., 495 F.3d 1243, 1257 (10th Cir. 2007). The Tenth Circuit has stated that "[l]iability under § 1983 must be predicated upon a *deliberate* deprivation of constitutional rights by the defendant, and not on negligence." Darr v. Town of Telluride, Colo., 495 F.3d at 1256 (emphasis in original)(internal quotation marks omitted). The Tenth Circuit has explained that:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations[.]

Carr v. Castle, 337 F.3d 1221, 1229 (10th Cir. 2003)(quoting Barney v. Pulsipher, 143 F.3d at 1307-08). The deliberate-indifference standard is not satisfied, however, by a nebulous assertion of the need for more or better training. See City of Canton v. Harris, 489 U.S. at 390-92. Instead, the

-14-

plaintiff must point to specific deficiencies in the portions of the training program most closely related to the alleged constitutional violation. See City of Canton v. Harris, 489 U.S. at 390-91. The plaintiff's obligation does not stop there, however, as the plaintiff must also show a direct causal connection between the failure to train and the violation of his constitutional rights. See Carr v. Castle, 337 F.3d at 1231.

### LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." NMSA 1978, § 41-4-2A. The New Mexico Legislature also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

NMSA 1978, § 41-4-2A. As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." NMSA 1978, § 41-4-2A. The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." NMSA 1978, § 41-4-2B.

The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

NMSA 1978, § 41-4-17A. A plaintiff may not sue a governmental entity of New Mexico, or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions granted

for governmental entities and public employees in the NMTCA.  See Begay v. State, 104 N.M. 483,

486, 723 P.2d 252, 255 (Ct. App. 1985), *rev'd on other grounds by* Smialek v. Begay, 104 N.M.

375, 721 P.2d 1306 (1986).  "Consent to be sued may not be implied, but must come within one of

the exceptions to immunity under the Tort Claims Act."  Begay v. State, 104 N.M. at 487, 723 P.2d

at 256.  Thus, if no specific waiver can be found in the NMTCA, the courts must dismiss a plaintiff's

complaint against the governmental entity or its employees.  See Begay v. State, 104 N.M. at 486,

723 P.2d at 255.

Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts law

enforcement officers commit and for their negligence that causes a specified tort.  See Oliveros v.

Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. Cnty. of Eddy, 95 N.M. 329, 333,

622 P.2d 234, 238 (1980);  Caillouette v. Hercules, Inc., 113 N.M. 492, 497, 827 P.2d 1306, 1311

(Ct. App. 1992)).  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does
> not apply to liability for personal injury, bodily injury, wrongful death or property
> damage resulting from assault, battery, false imprisonment, false arrest, malicious
> prosecution, abuse of process, libel, slander, defamation of character, violation of
> property rights or deprivation of any rights, privileges or immunities secured by the
> constitution and laws of the United States or New Mexico when caused by law
> enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

> [I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-
> 12, a plaintiff must demonstrate that the defendants were law enforcement officers
> acting within the scope of their duties, and that the plaintiff's injuries arose out of
> either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe *ex rel.* Santa Fe Police Dep't, 121 N.M. 646, 649, 916 P.2d 1313,

1316 (1996).  The NMTCA does not waive sovereign immunity for simple negligence of law-

enforcement officers.  See Caillouette v. Hercules, Inc., 113 N.M. at 497, 827 P.2d at 1311.  The

-16-

Supreme Court of New Mexico has stated that "no case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in [§ 41-4-12]." Bober v. N.M. State Fair, 111 N.M. 644, 654, 808 P.2d 614, 624 (1991). The Court of Appeals for New Mexico has construed § 41-4-2A of the NMTCA as "evincing a legislative intent not to waive immunity for injuries to indirect or incidental victims of tortious acts committed by government employees." Lucero v. Salazar, 117 N.M. 803, 806, 877 P.2d 1106, 1109 (Ct. App. 1994). The Supreme Court of New Mexico further held that the Legislature has not waived immunity for claims of intentional infliction of emotional distress, see Garcia-Montoya v. State Treasurer's Office, 130 N.M. 25, 43, 16 P.3d 1084, 1102 (2001)(upholding dismissal of intentional infliction of emotional distress claim, because immunity is not waived under NMTCA), or for negligent infliction of emotional distress, see Weinstein v. City of Santa Fe *ex rel*. Santa Fe Police Dep't, 121 N.M. at 653, 916 P.2d at 1320 (holding that the NMTCA does not enumerate negligent infliction of emotional distress as a common-law tort for which immunity has been waived).

## ANALYSIS

The Defendants did not violate D. Lovelace's substantive due-process rights. Moreover, there was no failure to supervise or to train. Further, the individual Defendants are entitled to qualified immunity and the claims of negligent and intentional infliction of emotional distress are barred by the NMTCA. The Defendants are thus entitled to have all of M. Lovelace's claims dismissed.

## I.    THE DEFENDANTS DID NOT VIOLATE D. LOVELACE'S SUBSTANTIVE DUE-PROCESS RIGHTS.

There was no state-created danger. Further, no special-relationship existed. Accordingly, the Defendants did not violate D. Lovelace's substantive due-process rights.

A.      THERE WAS NO STATE-CREATED DANGER.

M. Lovelace contends:

Defendants created the risk of serious bodily harm and death and were deliberately indifferent to the obvious risk of serious harm to D[.] Lovelace by putting her into a highly volatile and dangerous situation where her stepfather was armed; law enforcement had surrounded his location with weapons drawn and pointed at the location and intentionally allowed and facilitated D[.] Lovelace entering the office where [G.] Lovelace was barricaded with a loaded weapon.

Complaint ¶ 36, at 8.  See id. ¶ 46, at 10.  M. Lovelace contends that the Defendants' conduct "shocks the conscience."  Id. ¶ 42, at 9.  The individual Defendants argue in their motion that M. Lovelace fails to allege in her Complaint "all of the prima facie elements necessary to invoke the danger creation exception."  Motion to Dismiss at 8.  They contend that the only danger was D. Lovelace's exposure to G. Lovelace's suicide attempt and that, based on the allegations, there was no danger that G. Lovelace would harm D. Lovelace.  See Motion to Dismiss at 8-9.  They further contend that there were no facts alleged indicating that D. Lovelace believed G. Lovelace would threaten her or that G. Lovelace might harm others.  See Motion to Dismiss at 9.  The Defendants argue that, "[b]ecause Plaintiffs [sic] were not at risk of harm from the alleged danger of Gary Joe's suicide attempt, there can be no 'danger creation' exception to the general rule that the Defendants are not liable to Plaintiff for Gary Joe's acts."  Id. at 9.  Without pointing to any legal authority, the individual Defendants argue that the mere possibility that there would be an exchange of gunfire was insufficient to satisfy the first element in the danger creation exception because it was not a real danger.  See Motion to Dismiss at 9.

Additionally, the individual Defendants argue, M. Lovelace does not allege that they "took any affirmative acts to create or increase Dakota's vulnerability to the alleged danger."  Motion to Dismiss at 9.  They contend that M. Lovelace bases her claim on the Defendants' failure to prevent

-18-

D. Lovelace from entering the office.  See Motion to Dismiss at 10.  The Defendants continue by arguing that, "[b]ecause there was no specifically alleged danger to Dakota, and because the Defendants did not create the dangerous situation," the first or third elements necessary to establish the danger-creation exception can not be met.  Motion to Dismiss at 10.  The Defendants emphasize that the risk of harm was that G. Lovelace would kill himself;  the risk was not that G. Lovelace would hurt D. Lovelace.  See Motion to Dismiss at 10.  Ultimately, the Defendants argue that their conduct did not constitute the degree of outrageousness necessary to be considered truly conscience shocking.  See Motion to Dismiss at 10-11.  They assert that "[a]llowing family members to try and talk to a person allegedly threatening suicide does not violate any clearly established law."  Motion to Dismiss at 11.  Accordingly, they argue, the individual Defendants are entitled to qualified immunity.

M. Lovelace responded that D. Lovelace "was allowed . . . to enter an armed confrontation and standoff; thereby placing [her] in a highly volatile and dangerous situation where she was at substantial risk of serious, imminent and proximate harm which were [sic] obvious under the circumstances."  Memorandum in Support of Plaintiff's Response, filed February 3, 2011 (Doc. 22)("Response Memorandum") at 5.  She further responded that the Defendants "placed Dakota Lovelace at risk of serious injury and possible death."  Response Memorandum at 5.

At the March 18, 2011 hearing, the parties clarified their theory of danger under a state-created danger theory.  The individual Defendants argued that the danger was that G. Lovelace would shoot himself.  See Tr. at 5:13-15 ("MR. WERKMEISTER: . . . And so the question arises, what was the danger?  And it's our position that the danger was that Gary Joe Lovelace would shoot himself that he would commit suicide.").  In contrast, M. Lovelace contended that the danger was to D. Lovelace, and it was an obvious and known risk of harm; G. Lovelace, who had a gun, knew

he was going to jail, and the officers were outside the office with guns pointed towards G. Lovelace. See Tr. at 33:18-23.  M. Lovelace argued that, by permitting D. Lovelace, a child, to go into that situation, the officers substantially increased the risk that she could be harmed.  See Tr. at 33:24-34:3.  She further argued that, by allowing D. Lovelace to go into the building, the officers exercised reckless disregard for the risk and that such acts shocked the conscience.  See Tr. at 34:6-12.  Both parties ultimately stated that how D. Lovelace came to enter the building was not overly relevant to the analysis.  See Tr. at 45:15-25.  M. Lovelace noted that she was not arguing that the sheriff's office created the danger, but that the danger escalated, because D. Lovelace, a child, was allowed to enter the situation.  See Tr. at 22:25-23:3 ("MR. BEAUVAIS: . . . we didn't say that the sheriff's office created the danger.  We said that the danger escalated considerably by allowing that child to go into this very difficult situation.").  M. Lovelace differentiated D. Lovelace's initial approach of the office from her entry with K. Lovelace into the office by stating that there was no constitutional violation when D. Lovelace approached the building on her own.  See Tr. at 28:14-20.

Viewing the facts most favorable to M. Lovelace, M. Lovelace has not adequately alleged a § 1983 claim under the state-created-danger doctrine against the individual Defendants.  Looking at the six-part test for danger creation, the only part of the test met by the alleged facts is that D. Lovelace was a member of a definable group -- a family member.  There are no facts that the County or the individual Defendants created the danger and, at the hearing, M. Lovelace conceded that the Defendants did not create the danger.  See Tr. at 22:25-23:3 ("MR. BEAUVAIS: . . . we didn't say that the sheriff's office created the danger.  We said that the danger escalated considerably by allowing that child to go into this very difficult situation.").  There are no allegations in the Complaint to suggest D. Lovelace did not enter the building voluntarily.  The Complaint asserts that a Lincoln County officer "allowed" D. Lovelace to approach the building and talk with G. Lovelace,

<u>see</u> Complaint ¶ 20, at 5, and that Shepperd "allowed" the women to enter the office.  <u>See</u> Complaint ¶ 25, at 6.  The Complaint is devoid of allegations that either K. Lovelace or D. Lovelace were not free to leave the office at any time they desired.  The fact that Defendants failed to prevent D. Lovelace from entering the building is not sufficient to support this type of claim.  <u>See</u> <u>Currier v. Doran</u>, 242 F.3d at 919 ("The danger creation theory, however, focuses on the affirmative actions of the state in placing the plaintiff in harm's way.").

Despite M. Lovelace arguing in her response that "it is hard to conjure up a hypothetical situation more dangerous than embroiling a child in a highly dangerous and volatile police standoff with an armed suspect and allowing her to become either a hostage or potential victim of gunfire," Doc. 22 at 9-10, there are no allegations that the Defendants put D. Lovelace in a substantial risk of serious, immediate and proximate harm, that the risk was obvious and known, or that the Defendants acted recklessly with conscious disregard of that risk.  The Complaint is devoid of allegations that the Defendants forced D. Lovelace to enter the office.  No facts allege that G. Lovelace at any time threatened either K. Lovelace or D. Lovelace with harm, or threatened law enforcement officers with harm.  To the contrary, the allegations suggest that the only person in danger of harm was G. Lovelace himself.  <u>See</u> Complaint ¶ 29, at 7.[3]  The Complaint is devoid of allegations that G. Lovelace at any time pointed a gun at anybody but himself.

At the hearing, M. Lovelace contended that the most reckless part of the event was when the sheriff went to the door and, with D. Lovelace inside, broke the glass, then lunged and wrestled G. Lovelace and D. Lovelace to the ground.  <u>See</u> Tr. at 31:17-25.  M. Lovelace asserted at the hearing that the police should have either not permitted D. Lovelace to enter the office or not showed up at

---

[3]At the hearing, M. Lovelace admitted that, in forming her analysis, whether anyone other than D. Lovelace was in danger of being harmed was not considered.  <u>See</u> Tr. at 36:6-13.

the property in the first place.  See Tr. at 32:21-23.  M. Lovelace contended that the situation into

which D. Lovelace entered, with the permission and almost encouragement of the police, was a

stand-off at which gun fire could erupt at any moment.  See Tr. at 31:17-25.  In her Complaint,

however, M. Lovelace has not shown that there was an immediate threat of danger to D. Lovelace

or to any other person.  In fact, D. Lovelace's injuries were minor.  See Complaint ¶ 34, at 7.[4] M.

Lovelace does not show that there was any likelihood of substantial or serious harm or injury to D.

Lovelace.  There are no facts indicating that the individual Defendants intended to harm D. Lovelace

or to place her unreasonably at risk of harm.

　　　　To succeed on a claim of recklessness, the litigant must show either an intent to harm or an

intent to place the person at a risk of harm.  See Uhlrig v. Harder, 64 F.3d at 573.  In Christiansen

v. City of Tulsa, the family of a man who committed suicide sued the police under the state created-

danger theory.  Opposite to the situation here, in that case, the police kept the family away from

Christiansen because he threatened to kill himself and everyone else who tried to enter the

apartment.  The police kept the family away to protect them as Christiansen was threatening to harm

others.  Ultimately, he shot himself, and the police were blamed for that event.  The Tenth Circuit

in Christiansen v. City of Tulsa found that there was no state-created danger because there was no

intent to place Christiansen unreasonably at risk of harm and the acts did not shock the conscience.

Here, all facts indicate that, at all times, other than at the time that officers stormed the office, but

even when D. Lovelace and K. Lovelace were in the office with him, G. Lovelace pointed the gun

only at himself.  G. Lovelace was not threatening others; his family did not seem to be concerned

that he would harm anyone else.  All facts in the Complaint indicate that the family was concerned

---

[4]At the hearing, M. Lovelace admitted that D. Lovelace was not seriously hurt in the scuffle.
See Tr. at 31:15-16.

about keeping G. Lovelace alive and wanted to keep G. Lovelace from killing himself.  While other professionals might not have done what Virden did, the Court cannot say that, under the particular facts of this case, the Defendants intended to harm D. Lovelace or to place her unreasonably at risk of harm.  Virden was acting to keep G. Lovelace from killing himself.  His actions were not constitutionally inappropriate.  M. Lovelace has not shown that the Defendants caused any increase of serious danger to D. Lovelace.  The officers did not act to affirmatively, or intend, to increase any danger to D. Lovelace, and the officers did not create or intend to create a danger.

### B.      NO SPECIAL RELATIONSHIP EXISTED.

M. Lovelace argues:

> By allowing a minor child, who was the stepdaughter of [G.] Lovelace, at a time Defendants knew she was at risk of being killed or incapacitated by Lovelace who was holding armed police officer[s] at bay with one or more loaded weapons, Defendants created a special relationship with D[.] Lovelace and became responsible for any harm or danger with respect to G[.] Lovelace.

Complaint ¶ 45, at 9-10.  She contends that the Defendants' acts shock the conscience.  See Complaint ¶ 48, at 10.

In their motion, the individual Defendants argue that M. Lovelace did not allege any involuntary restraint, a requirement to succeed on a duty-to-protect claim under the special-relationship theory and, therefore, the Court should dismiss the claim.  See Motion to Dismiss at 7. The Court agrees.  The Complaint lacks any facts indicating that there was a custodial relationship between D. Lovelace and any of the Defendants.  There are no allegations in the Complaint to suggest D. Lovelace did not enter the building voluntarily.  The Complaint asserts that a Lincoln County officer "allowed" D. Lovelace to approach the building and talk with G. Lovelace, Complaint ¶ 20, at 5, and that Shepard "allowed" the women to enter the office, id. ¶ 25, at 6.  The Complaint is devoid of allegations that either K. Lovelace or D. Lovelace were forced to enter the

office, or were not free to leave the office at any time they desired.  Because there was no involuntary restraint, the officer lacked a duty to protect D. Lovelace under the special-relationship theory.

      **C.**      **THE DEFENDANTS' ACTS DID NOT SHOCK THE CONSCIENCE.**

Even if sufficient conduct would have been shown by M. Lovelace to demonstrate a special-relationship or a state-created-danger, none of the Defendants' acts "shock the conscience of federal judges." Ruiz v. McDonnell, 299 F.3d at 1183.  The Defendants' conduct was mere negligence at best, and it does not meet the requirements that the Defendants' behavior was reckless and performed with a conscious disregard to the risks.  Certainly the conduct does not meet the "conscience shocking" part of the test for purposes of a motion to dismiss.  From the facts that M. Lovelace alleges, the Defendants' conduct does not rise to a degree of outrageousness, or a magnitude of potential or actual harm, that is truly conscience-shocking.  Plaintiff has failed to state a valid substantive due-process claim.  See Ruiz v. McDonnell, 299 F.3d at 1182-83.  There has been no violation of D. Lovelace's substantive due-process rights.

**II.**      **THERE WAS NO FAILURE TO SUPERVISE OR TRAIN.**

M. Lovelace asserts a claim for failure to supervise against the County of Lincoln and Virden.  See Complaint at 10.  In that claim, M. Lovelace makes no specific assertions against Virden.  M. Lovelace contends: "County of Lincoln failed, and continues to fail, to properly train, supervise and/or discipline their employees regarding the protection of vulnerable citizens from situations known to be dangerous, resulting in the unconstitutional failure to protect Mechel Lovelace and Dakota Lovelace from physical and emotional harm."  Complaint ¶ 51, at 11.  She further contends that "[t]he inadequate training and/or supervised personnel by Defendants resulted in a conscience [sic] or deliberate choice to follow a course of action from available altercation

known to Defendants."  Complaint ¶ 52, at 11.  She also contends that "[s]uch policies as well as Defendants['] actions and inactions violated Plaintiffs substantive due process rights under the Fourteenth Amendment to the United States Constitution" and that the conduct shocks the conscience.  Complaint ¶¶ 53 & 55, at 11.

M. Lovelace has only alleged, without any factual support, that the County of Lincoln failed to train its officers adequately with respect to the "protection of vulnerable citizens from situations known to be dangerous." Complaint ¶ 51, at 11.  M. Lovelace has not shown that a constitutional violation occurred.[5]  Moreover, she has not pointed to any specific supervisory or training deficiencies.  She had not described any acts by Virden with regard to supervision or training.  She has not shown the alleged unconstitutional conduct stemmed from a failure to train rather than a purported failure to follow the training provided.  Further, even if she had cited to specific training deficiencies, she has not shown any direct causal connection between a purported supervisory or training deficiency and the alleged constitutional violation.  There are no acts asserted that shock the conscience in this regard.

## III.   THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendants argue that, because M. Lovelace cannot establish a constitutional violation with regard to her substantive due-process claims, the individual Defendants are entitled to qualified immunity.  To overcome a defendant's assertion of qualified immunity, a plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107.  The Court has already established that M. Lovelace has not

---

[5] M. Lovelace has not alleged any facts in support of her general argument that the Plaintiffs' substantive due-process rights were violated other than with regard to D. Lovelace.

sufficiently alleged a constitutional violation.  Plaintiff has not demonstrated that any of the officers have violated either M. Lovelace's or D. Lovelace's constitutional rights.  Accordingly, the individual Defendants are entitled to qualified immunity on M. Lovelace's constitutional claims. Further, because there were not sufficient facts to show that the individual Defendants, employees of the County, committed a constitutional violation, the County of Lincoln cannot be held liable under § 1983 for those employee's acts.  See Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1316.  The Court will dismiss all of the federal constitutional claims.[6]

## VI.    THE NEW MEXICO LEGISLATURE HAS NOT WAIVED IMMUNITY UNDER THE NMTCA.

Under her fourth claim for relief entitled "Pendente [sic] State Claim for Constitutional Violation and Intentional and Negligent Infliction of Emotional Distress," M. Lovelace argues that "[t]he State of New Mexico has waived sovereign immunity for unconstitutional and negligent conduct by law enforcement officers acting within the scope of employment and under color of

---

[6] The Court may dismiss a complaint *sua sponte* under rule 12(b)(6) for failure to state a claim if "it is 'patently obvious' that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile." Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir. 1991)(quoting McKinney v. Okla. Dep't of Human Servs., 925 F.2d 363, 365 (10th Cir. 1991)).

> A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.  Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.

Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010)(quoting Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)). Here, M. Lovelace does not allege any specific Lincoln County policy or custom, and no constitutional provision has been shown to have been violated.  Without an underlying constitutional violation, no municipal liability exists.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  M. Lovelace acknowledged at the hearing on this motion that amending the Complaint would be futile. See Tr. at 41:19-42:6.  The claims against Lincoln County will be dismissed.

law." Complaint ¶ 57, at 12.  She asserts that the Defendants each owed a duty to M. Lovelace and

D. Lovelace "which was breached and the cause and proximate cause of harm."  Complaint  ¶ 58,

at 12.

The Defendants argue that, because intentional and negligent infliction of emotional distress

are not torts that are enumerated in § 41-4-12 of the NMTCA, M. Lovelace cannot bring a claim for

them.  See Motion to Dismiss at 12.  The Defendants also assert that M. Lovelace has not alleged

any statutory deprivation upon which she can base a claim for damages under that same section of

the NMTCA.  See Motion to Dismiss at 13.  They contend that, because the alleged constitutional

deprivation fails to state a claim upon which relief may be granted, the alleged constitutional

deprivations cannot be the basis for M. Lovelace's claim under the NMTCA.  See Motion to Dismiss

at 13.

Under New Mexico law "[a] governmental entity is not immune from liability for any tort

of its employee acting within the scope of duties for which immunity is waived."  Weinstein v. City

of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. at 652, 916 P.2d at 1319.  M. Lovelace has not

shown that a constitutional violation has occurred.[7]  She has also not asserted any other facts upon

which a waiver of sovereign immunity could be based and does not point to a specific provision of

---

[7] M. Lovelace's reference to the "constitution" in her fourth claim regarding state law may be a reference to the New Mexico Constitution. She fails, however, to cite to any particular provision of that constitution in her Complaint. In any case, a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution unless immunity is waived under the NMTCA.  See Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1997).  She does not point to any waiver of immunity of her due-process claim if asserted under the New Mexico Constitution.  At the hearing, M. Lovelace stated that the NMTCA was just "another body of law" to use to allege the constitutional tort.  Tr. at 40:3-4 ("MR. BEAUVAIS . . . Our focus on the Tort Claims Act was simply under another body of law to restating the constitutional tort."). This statement, particularly noting the lack of cite to the New Mexico Constitution, suggests that she is trying to forward her unsuccessful federal constitutional claim. In any case, she does not have a viable due-process claim under either Constitution.

-27-

the NMTCA waiving that immunity.  Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts law enforcement officers commit and for their negligence that causes a specified tort.  See Oliveros v. Mitchell, 449 F.3d at 1096; Caillouette v. Hercules, Inc., 113 N.M. at 497, 827 P.2d at 1311.  No waiver has been provided "for injuries to indirect or incidental victims of tortious acts committed by government employees," Lucero v. Salazar, 117 N.M. at 806, 877 P.2d at 1109; or for claims of intentional infliction of emotional distress, see Garcia-Montoya v. State Treasurer's Office, 130 N.M. at 43, 16 P.3d at 1102; or for negligent infliction of emotional distress, see Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. at 653, 916 P.2d at 1320. See Hernandez ex rel. Estate of Medrano v. Frias, No CIV 10-0351 JB/LAM, slip op., 2011 WL 1127882, at *16 (D.N.M. March 15, 2011)(Browning, J.).  M. Lovelace's claims under the NMTCA, therefore, fail.

Because the Complaint fails to state a claim to relief that is plausible on its face, the Court will grant the motion and dismiss the Complaint in its entirety.

**IT IS ORDERED** that Defendants' Motion to Dismiss and for Qualified Immunity and for a Stay of Discovery, and Supporting Memorandum, filed January 12, 2011 (Doc. 19) is granted.  The First Amended Complaint is hereby dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

John R. Beauvais
J. Robert Beauvais, P.A.
Ruidoso, New Mexico

        Attorney for the Plaintiff

-28-

H. Nicole Werkmeister
Neisha Lujan
Narvaez Law Firm, P.A.
Albuquerque, New Mexico

   *Attorneys for the Defendant*